# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Fifth Side Lodging, LLC,

               Plaintiff,

v.

Rise Construction Services, LLC and
Christian Lawrence,

               Defendants and
               Counterclaim Plaintiffs,

v.

Fifth Side Lodging, LLC, Jayshal Bhakta,
Ravikumar Patel, and Balvant Patel,

               Counterclaim Defendants.

Civil No. 23-cv-2649 (JMB/ECW)

**ORDER**

---

This matter is before the Court on Plaintiff Fifth Side Lodging, LLC's ("Fifth Side") Motion for Prejudgment Attachment. (Dkt. 21.) For the reasons stated below, the Motion is denied.

## I.  BACKGROUND

### A.  Pleadings

On August 28, 2023, Fifth Side initiated this action alleging, among other things, breach of a construction contract between Fifth Side and Defendant Rise Construction Services, LLC ("the Agreement"). (*See generally* Dkts. 1, 7, 18.) Fifth Side filed an Amended Complaint on September 12, 2023, which is the operative complaint in this case. (Dkt. 7.) Pursuant to the Agreement, executed on June 1, 2023, Rise Construction

Services ("Rise Construction") was to serve as Fifth Side's general contractor in the construction of a hotel in Edina, Minnesota ("the Project"). (*See* Dkt. 7 ¶¶ 8, 32; Dkt. 18 at 4 ¶ 20, 6 ¶ 44.)[1]  Rise Construction terminated the Agreement on August 18, 2023. (*See* Dkt. 7 ¶ 53; Dkt. 18 at 7 ¶ 53, 30 ¶ 92.)

In the Amended Complaint, Fifth Side seeks a declaratory judgment with respect to the parties' rights and obligations under the Agreement, asserts claims for breach of contract and breach of the implied duty of good faith and fair dealing against Rise Construction, and seeks injunctive relief prohibiting the dispersal of a $2.4 million down payment made by Fifth Side. (Dkt. 7 ¶¶ 70-89.)  Fifth Side also asserts claims of fraudulent misrepresentation against Rise Construction and its CEO, Defendant Christian Lawrence. (*Id.* ¶¶ 90-10.)  The Amended Complaint also asserted a claim for civil theft against Rise Construction and Christian Lawrence. (*Id.* ¶¶ 101-05.)  However, Defendants moved to dismiss the fraudulent misrepresentation and civil theft claims and all claims against Christian Lawrence on December 22, 2023 (Dkt. 39) and Fifth Side dismissed the civil theft claim on January 29, 2024 (Dkt. 51).  The remainder of the Motion to Dismiss is under advisement. (Dkt. 53.)

In Defendants' Answer and Defendant Rise Construction's Counterclaims filed on November 13, 2023, Defendants deny the allegations in the Amended Complaint and assert several defenses. (*See* Dkt. 18 at 1-10; *see also id.* at 11-12 ¶¶ 1-9.)  Rise Construction also asserts counterclaims against Fifth Side for breach of contract and

---

[1]    Unless otherwise indicated, all page citations are to the CM/ECF pagination.

seeks a declaratory judgment as to the parties' rights and obligations under the Agreement.  (*Id.* at 31-32 ¶¶ 95-108.)

Rise Construction has also asserted a third counterclaim seeking enforcement of guarantees against Jayshal Bhakta, Ravikumar Patel, and Balvant Patel (collectively, "the Guarantors").  (*Id*. at 33-34 ¶¶ 109-115.)

On December 21, 2023, Fifth Side and the Guarantors filed a Reply generally denying the allegations in the Answer and Counterclaim.  (Dkt. 38.)

**B.     Factual and Procedural Background**

The parties have submitted several affidavits and exhibits in connection with the Motion.  (*See, e.g.*, Dkts. 24 (Affidavit of Jayshal Bhakta), 25 (Affidavit of Balvant Patel), 25-1 (Exhibits 1-9 to Balvant Patel Affidavit), 29 (Affidavit of Christian Lawrence), 29-1 to 29-3 (Exhibits 1-3 to Christian Lawrence Affidavit)), 30 (Affidavit of Jeff Kacerik), 30-1 (Exhibits 1-5 to Jeff Kacerik Affidavit), 31 (Affidavit of Troy Tiddens), 31-1 (Exhibits 1-6 to Troy Tiddens Affidavit), 32 (Affidavit of James Lawrence), 33 (Affidavit of Sean Stiras), 35 (Supplemental Affidavit of Jayshal Bhakta), 35-1 (Exhibits 10-11 to Supplemental Affidavit of Jayshal Bhakta), 37 (Post-hearing Exhibit filed by Timothy Sullivan), 37-1 (Exhibits 1-2 to Post-hearing Exhibit ).)  The Court has reviewed the evidence and summarizes the relevant aspects below, referring to the affidavits and exhibits by their CM/ECF docket number.

According to Guarantor Balvant[2], Fifth Side is an affiliate of a privately owned hospitality firm called Hawkeye Hotels, Inc., which develops, constructs, and manages properties in over 15 states.  (Dkt. 25 ¶¶ 2-4; *see* Dkt. 7 ¶ 6.)  Balvant is the CEO of Hawkeye Hotels and a principal of Fifth Side.  (Dkt. 25 ¶ 2.)  The other principals of Fifth Side are Guarantor Ravikumar ("Ravi") Patel, also the President of Hawkeye Hotels, and Guarantor Jayshal ("Jay") Bhakta.  (*Id.* ¶ 4.)

According to Christian Lawrence, Rise Construction was founded in 2020 and serves as the general contractor on modular construction projects.  (Dkt. 29 ¶¶ 1-2, 7.)  He describes "volumetric modular construction" as "including multi-family and hospitality projects," where "[v]olumetric modular structures provide fully enclosed six-sided modules with completed interiors."  (*Id.* ¶ 5.)  Christian Lawrence is the CEO of Rise Construction, as well as the CEO of Rise Modular, LLC, which he founded in 2019 "to fill a void in the middle American market and particularly Minnesota."  (*Id.* ¶¶ 2, 6.)  Rise Construction and Rise Modular have the "financial support" of Christian's father, James Lawrence, as Christian detailed in his affidavit:

> My companies have had the financial support of my father throughout the process of building a factory in Owatonna, MN and launching a modular building business. My father invested in an entity, Ninth Street Investments, LLC ("Ninth Street"). Ninth Street has financed general operations and provided operating capital for Rise Construction and Rise Modular. This includes capital for projects not slated to make profit. We have taken jobs at a loss to build our portfolio and enhance long range prospects.

(*Id.* ¶ 9.)

---

[2]     As many of the persons involved in the negotiations share last names, to avoid confusion, the Court uses first names to refer to those people.

By affidavit, James confirms his investment in Ninth Street and Ninth Street's investment in Rise Construction and Rise Modular.  (Dkt. 32 ¶¶ 3, 5.)  James describes his support for his son's businesses as follows:

> Over the approximately five (5) years that I have been an investor in Ninth Street, I have funded each and every capital request Ninth Street has made of me (as, when and in the manner requested). The principal purpose of these capital calls have been, and will likely continue to be, to satisfy the capital needs of Ninth Street's investments, including the working capital [Rise Modular] and [Rise Construction] require from time-to-time.

(*Id.* ¶ 5.)

According to Christian, Rise Modular has a "preconstruction team" that "works on design integration, drafting, show drawings, finding material vendors, and buying materials and equipment for the job."  (Dkt. 29 ¶ 15.)  The Rise Modular factory is "specially outfitted," with "various cranes and moveable platforms allowing a module to go from framing to fully furnished units with complete kitchens, bathrooms, flooring, paint, light fixtures, appliances, and in some cases, even furniture."  (*Id.* ¶ 10.)  The modules move through approximately 25 stations during a project, depending on the project, and "[t]he interior hallway wall sections are left open to allow on-site structural, mechanical, electrical, and plumbing connections between modules."  (*Id.* ¶¶ 11-12.)  The completed modules are then "shrink-wrapped, transported on special trailers, and lifted into place by cranes at a project site."  (*Id.* ¶ 13.)  They may be outfitted with finished kitchens, bathrooms, flooring, paint, light fixtures, appliances, and "in some cases even furniture before they leave the Rise Modular factory."  (*Id.* ¶ 14.)  Christian affirms that the Rise Modular factory can only "accommodate one project at a time," and the cost to

5

operate Rise Modular's "production line is at least $36,000 per day, and the cost of the factory space alone is an additional $36,000 per day." (*Id.* ¶ 19.)

As for Rise Construction, Christian states that its "general contracting pre-construction activities include finding, bidding, negotiating, and executing subcontracts, coordinating site logistics, scheduling, and sequencing work, etc." (*Id.* ¶ 15.) This work is "vital," must be done with precision, and requires custom materials "well in advance to keep a project moving in time," where the custom materials "cannot be cancelled without difficulty," if at all. (*Id.* ¶¶ 16-17.)

Turning to the parties' negotiations, beginning in May 2019, Jay, Ravi, and Balvant began negotiating with Christian for Rise Modular to provide modular units for the construction of a Fairfield Inn and Townplace Suites located in Edina, Minnesota. (Dkt. 25 ¶ 5; Dkt. 29 ¶ 21.) Negotiations continued, including "at least twelve occasions" where Jay, Ravi, Balvant, and Christian personally met to better understand each company's history in the industry, general business practices, overall ability to bring the Project to timely completion, and financial health." (Dkt. 25 ¶¶ 6-7.) In addition, Fifth Side personnel "took multiple tours" of Rise Modular's factory in Owatonna and paid for the construction of a mock model modular unit. (*Id*. ¶¶ 6-8.) Christian told Fifth Side that Rise Modular "was financially backed by significant personal family liquidity as well as several outside investors." (*Id.* ¶ 8.)

The Project was put on hold due to the Covid-19 pandemic in 2020, but negotiations renewed in 2022, after Christian had formed Rise Construction. (*Id*. ¶¶ 11-12; Dkt. 29 ¶¶ 22-23.) Balvant states that Rise Construction submitted bids of $27.8

6

million, $26.86 million, $26.669 million, and $26.28 million to Fifth Side, all of which were rejected because the Project was only budgeted for $25 million, and on March 16, 2023, Rise Construction agreed to do the Project for $25 million.  (Dkt. 25 ¶¶ 12-13.) Fifth Side accepted the $25 million bid.  (*Id*. ¶ 13.)

However, by May 8, 2023, Lawrence and "a team of Fifth Side executives" met to discuss Rise Construction's roughly $1.6 million deficit arising from a difference between Rise Construction's "scope narrative" and "the matrix used to price" the Project. (*Id*. ¶¶ 14-15.)  Balvant states that "[a]s a gesture of good faith and in an attempt to maintain the schedule," Fifth Side assumed approximately 50 percent of the deficit costs while Rise Construction assumed the remaining costs, so they could keep the overall Project price at $25 million.  (*Id*. ¶ 15.)

Contract negotiations continued, during which Rise Construction added provisions to Section 5 of the Agreement requiring an initial $2.4 million down payment by Fifth Side and a $2 million termination fee.  (*Id*. ¶ 16; Dkt. 29 ¶ 34.)  Also added to Section 5 were terms establishing Rise Construction's right to seek reasonable assurances of Fifth Side's ability to meet its financial obligations when Rise Construction saw fit and establishing Fifth Side's obligation to pay "all progress payments" to Rise Construction, including payments under purchase orders (sometimes referred to as "pay application requests" or "Pay Apps") for materials and equipment for the Project after execution of the Agreement.  (Dkt. 29 ¶ 34; *see* Dkt. 25 ¶ 22 (describing pay application requests).) Rise Construction also required personal guarantees from the Guarantors, which they provided.  (Dkt. 29 ¶ 24; Dkt. 25 ¶ 16.)

In late May 2023, Hawkeye Hotel's Vice President of Investment, Parth Patel, sent Christian "a timeline with closing details" that included "a credit commitment from Minnwest Bank to move forward by May 26," an appraisal to occur around June 16, and to have the loan documents finalized around June 23.  (Dkt. 25 ¶ 17.)  Christian responded on the same day by email, thanking Parth for the update and stating he appreciated "the transparency."  (*Id*. ¶ 17; Dkt 25-1 at 1.)

Fifth Side and Rise Construction executed the Agreement on June 1, 2023.  (Dkt. 25 ¶ 18; Dkt. 29 ¶ 39.)  Article 5, which includes the $2.4 million "non-refundable, fully-vested down payment" and additional terms negotiated by Rise Construction, is reproduced below:

> § 5.0 Initial Down Payment and Security Owner shall make a series of payments to Contractor and provide additional security for these payments as follows:
>
> > § 5.0.1 Once Contractor executes this Agreement, Owner shall owe and pay Contractor a non-refundable, fully-vested down payment to be credited against the Contract Sum in the amount of two million four hundred thousand dollars ($2,400,000) ("Owner's Down Payment"), which will be paid as follows:
> >
> > > § 5.0.1.1 One million dollars ($1,000,000.00 within forty-eight (48) hours of Contractor executing this Agreement.
> > >
> > > § 5.0.1.2 One million and four hundred thousand dollars ($1,400,000.00) within thirty (30) days of the Contractor executing this Agreement.
> >
> > § 5.0.2 In addition to making the Owner's Down Payment, Owner will pay all progress payments to Contractor according to the terms of this Agreement. After receiving the second installment of the Owner's Down Payment, Contractor may request and Owner shall provide reasonable evidence that Owner has the financial capability to continue fulfilling all

of its financial obligations under this Agreement ("Owner's Financial Assurances").

§ 5.0.3 Upon full execution of this Agreement, Contractor will begin issuing purchase orders to vendors, suppliers, and Subcontractors for Project materials and equipment. The Owner agrees that it is, and remains responsible and liable for, all vendor, supplier, and Subcontractor payments under any purchase order that Contractor issues for Project materials and equipment after full execution of this Agreement.

§ 5.0.4 Owner will obtain and pay for the Project's building permit from the City of Edina within three (3) business days after Owner is informed that the permit is ready to be picked up.

§ 5.0.5 On the date that Contractor executes this Agreement, the Owner's three (3) principals—Ravi Patel, Bob Patel, and Jay Bhakta—will each execute and provide personal guarantees making each of them jointly and severally liable for all of Owner's financial obligations set forth in this Section 5.0. The parties agree that these personal guarantees will be released upon the Owner (a) closing on its construction loan for the Project, and (b) providing Contractor with evidence that the loan funds have been deposited into escrow with a reputable title company.

§ 5.0.6 If the Owner (a) fails to pay the Owner Down Payment as required above, (b) fails to make any progress payment owed to Contractor according to the terms of this Agreement, (c) fails to provide Contractor with the Owner's Financial Assurances, or (d) fails to obtain and pay for the Project's building permit (each an "Owner Financing Default"), then upon fourteen (14) days' written notice and the Owner having an opportunity to cure, the Contractor may terminate this Agreement if the Owner Financing Default is not cured. If, however, there are more than two (2) instances of an Owner Financing Default, then Contractor may terminate this Agreement upon forty-eight (48) hours' notice to Owner.

§ 5.0.7 If Contractor terminates this Agreement due to an Owner Financing Default, then Owner shall pay to Contractor within five (5) days an amount equal to the Owner's Down Payment, plus any progress payments owed to Contractor, less any Owner's Down Payment and progress payment amounts previously paid by Owner, plus a termination fee as follows:

    1. $1,000,000 if termination occurs between July 1 and July 31, 2023;

2. $2,000,000 if termination occurs any time after July 31, 2023;

Notwithstanding anything in this Section 5.0.7, Contractor agrees that it shall not be entitled to recover a termination fee from the Owner following the Owner (a) closing on its construction loan for the Project, and (b) providing Contractor with evidence that the loan funds have been deposited into escrow with a reputable title company.

§ 5.0.8 Following Contractor's termination of this Agreement due to an Owner Financing Default, Owner shall also directly pay all vendor, supplier, and Subcontractor invoices for any purchase order that Contractor issued for the Project. Contractor will work with the Owner and use commercially reasonable efforts to terminate any purchase order issued before Contractor terminates this Agreement so that the Owner can obtain returns, discounts, refunds, and restocking arrangements with the vendors, suppliers, and Subcontractors in order to reduce the amounts that Owner is required to pay under those vendor, supplier, and Subcontractor purchase orders.

(Dkt. 29-1, Ex. 2 at 7-8.)

Fifth Side made the first partial payment of $1 million on June 2, 2023 and the second partial payment of $1.4 million, on June 30, 2023. (Dkt. 25 ¶ 19; Dkt. 29 ¶ 39.) Fifth Side acknowledges these payments were "[p]er the terms of the Agreement." (Dkt. 25 ¶ 19.)

Between the two partial payments, on June 20, 2023, Christian emailed Parth and Jay asking about financing for the Project and for confirmation that Fifth Side would make the second partial payment the following week. (Dkt. 25 ¶ 20; Dkt. 25-1, Ex. 3 at 13.) Parth replied the next day that: "From loan standpoint, we have the approval appraisal in is the process. Minnwest bank is our lender, they need 2.5M in participation so they working towards getting this lined up." (Dkt. 25-1, Ex. 3 at 12-13.) Christian did not respond to that email. (Dkt. 25 ¶ 20; see Dkt. 25-1, Ex. 3 at 12.)

On July 11, 2023, after Fifth Side made the second partial payment, Parth told Christian by email that: "The bank has participants lined up and they are waiting on their final approval, we did receive draft loan docs so we are hoping to close in the next 3-4 weeks." (Dkt. 25-1, Ex. 3 at 12.)  Christian responded, "Glad to hear it!  Keep us posted." (*Id.*)

However, on July 24, 2023, Rise Modular's general counsel Stephanie Sundry sent Fifth Street a letter noting that Rise Construction had begun issuing purchase orders for the Project, noting that the Project was not yet fully financed, and invoking Section 5.0.2 of the Agreement to request "evidence that [Fifth Side] has the capability to continue fulfilling all its financial obligations under the Agreement regardless of whether a construction loan is in place." (Dkt. 25-1, Ex. 4 at 19-21.)  Parth responded the next day that: "[L]oan closing is in process, we have received the draft loan docs and we are waiting on few items from Marriott.  We expect to close on the loan in the next 2-3 weeks." (*Id.* at 18.)  Parth further stated: "Most of the upfront cost would be funded from our equity so we do not expect any delays from our end." (*Id.*)

Sundry responded the same day with additional questions, reiterating that the next purchase orders would be significant, and again requesting documentation regarding ability to pay:

> Thank you, Parth. It's good to hear that things are progressing with the loan. Has an actual date been set for closing? Are there things you're waiting to receive from Marriott that put the project, or timing of closing, at risk? Any additional risks we should be aware of?
>
> The next couple of Pay Apps you will receive from Rise Construction Services will not be insignificant. Do you have cash available to make the

payments if the loan doesn't close in the next 2-3 weeks? Are those funds verifiable (ie. bank statements, etc.)?

We are confident things will come together for the project, but we too have a risk management process. We need some type of documentation substantiating your future ability to pay as we continue to submit additional purchase orders and make additional project commitments. Please provide whatever information you have. Of course, once the loan is closed and the project is fully funded and held in escrow, this type of seemingly intrusive diligence will no longer take place. Until then, however, we need to monitor our downside risk, even if it's a low probability, so please provide whatever documentation you have.

Thank you again!

(*Id.* at 17-18.)

Parth responded to this request on the same day with the short statement: "The items we are waiting on from Marriott do not put the timing of closing at risk, it can be a post-closing item as well. Survey needed to be updated and that is in process as well, as soon as that is completed we should be able to close." (*Id.* at 17.)

The next day, July 27, 2023, Sundry responded to Parth's email noting "the contract was signed almost 60 days ago and financing is not yet secured," and again invoking the financial assurances provision in the Agreement:

Per the financial assurance provision in the contract, Rise requires verifiable documentation evidencing that Owner has sufficient funds to satisfy all its financial obligations outlined in the Construction Agreement.

Please provide a copy of an updated Commitment Letter from your lender detailing terms and conditions to closing and the closing date, as well as copies of Owner's most recent bank statements evidencing cash on hand. As you know, Rise has assumed a great deal of risk proceeding to procure materials, submit purchase orders, engage subcontractors, and set aside factory production time. The contract is clear that Rise is entitled to evidence, satisfactory to Rise, that Owner has adequate financial resources to fund the project.

Please send materials my way no later than end of the day tomorrow, the 28th of May. Thank you.

(*Id.* at 16-17.)

Parth responded the same day:

I don't believe the bank issue an updated commitment letter, they issue it once and then the loan moves into the closing stage. As an alternative, I will put you in an email thread with our lender so that he can confirm where the loan stands for you for your comfort.

As per the bank statement, I will send that directly to you as well.

We do have over 2M in deposits at this point in time, so you can be assured that the loan will close and this project is moving forward.

(*Id.* at 16.)

Fifth Side also sent bank statements from their principals "showing $6,077,835.60 in available cash flows continue fulfilling its financial obligations and paying any draw requests." (Dkt. 25 ¶ 24.) The next day, July 28, 2023, the lender at Minnwest Bank sent an email to Parth and Sundry stating: "Yes, we are still working towards closing. My attorney is out of the country this week, but I will touch base with him Monday. Parth, I will reach out to you right after so we can jump on a call to go through the closing checklist." (Dkt. 25-1, Ex. 5 at 23.)

On August 2, 2023, Rise Construction, through outside counsel, sent Fifth Side a letter stating the bank records showing $6 million in cash and email from Minnwest Bank did not meet the contractual requirements for financial assurances under Section 5.0.2, and in fact showed Fifth Side "[did] not have the financial capability to continue fulfilling all of its obligations under the Agreement," because approximately $22.7 million

remained on the Agreement balance and the bank records showed a balance of approximately $6 million.  (Dkt. 25-1, Ex. 6 at 26-27.)  Rise Construction therefore gave notice under Section 5.0.6 of the Agreement that it would "terminate the Agreement in fourteen (14) days if [Fifth Side] fails to deposit all amounts due and payable under the Agreement with a mutually agreed upon third-party title company that will disburse the funds in accordance with the terms of the Agreement." (*Id.* at 27.)

On August 3, 2023, Rise Construction informed Jay that, consistent with Section 3 of the Agreement, "Rise will only sign [a consent form required by the bank] and agree to the representation in Section 3 once the Loan Agreement and Settlement Statement are signed and the loan is funded.  We trust you'll have this discussion with the Minn[w]est [Bank] to ensure they agree with this order of operations."  (Dkt. 35-1, Ex. 10 at 2.)  Rise Construction further stated: "[Fifth Side] is still in default under the Owner's Financial Assurances provision of the Contract and Rise reserves all rights." (*Id.*)

On August 15, 2023, Christian emailed Parth and Jay: "Do you guys have a [sic] update on timing for the environmental review and new closing date?"  (Dkt. 25-1, Ex. 7 at 33.)  Parth responded the same day: "We received confirmation that the environmental will be delivered 8/24, we expect closing to be after the delivery of the environmental report.  I will confirm the date once it is confirmed from the Banks [sic] end." (*Id*. at 32.)

The next day, on August 16, 2023, Fifth Side, through outside counsel, sent a letter to Rise Construction denying that the financial assurances term of the Agreement required Fifth Side to "have the entire Contract Sum balance in an account in order to provide reasonable evidence that the Owner has the financial capability to continue

fulfilling all of its financial obligations." (Dkt. 25-1, Ex. 8 at 35.) Fifth Side referenced an attached letter from the Vice President of Investment for Hawkeye Hotels describing the financial state of that entity and concluding "with over $27 million in recurring free cash flow and $37 million in upcoming positive liquidity events, Hawkeye [sic] more than capable of satisfying any upcoming draw requests for Fifth Side Lodging, LLC." (Dkt. 25-1, Ex. 8 at 35-39.) Fifth Side further stated:

> [Fifth Side] is also in the process of obtaining a construction loan for the project set forth in the Agreement. The loan is expected to close by the end of the month. Enclosed is an email from Brad Steiner, the Senior Vice President at Minnwest Bank, reflecting that the construction loan has been approved and the loan documents have been prepared and the terms agreed upon. The lender is waiting on a new environmental report which is supposed to be received the middle of next week. The lender has indicated that the report will be reviewed immediately upon receipt so that the loan can be closed.

(*Id.* at 36.) Finally, Fifth Side argued that its cure rights "would reasonably require adequate opportunity for" Fifth Side "to close on its construction loan" and that it had "provided everything that is required under the Agreement to provide evidence of [its] continued ability to meet its financial obligations." (*Id.*)

Two days later, on August 18, 2023, Rise Construction responded: "[Fifth Side's] interpretation of Article 5 in the Agreement is wrong. [Fifth Side] has been in default and has not timely cured the defaults. Accordingly, Rise is terminating the Agreement effective immediately." (Dkt. 25-1, Ex. 9 at 23; *see* Dkt. 25 ¶ 29.)

Notwithstanding this letter, as of August 22, 2023, it appears that Fifth Side was still attempting to secure financing for the Project, as an August 22, 2023 email from counsel indicates Fifth Side was targeting August 24, 2023 for the "proposed closing"

and identifying "open legal items." (Dkt. 35-1, Ex. 11 at 7-9.) The open legal items included a "Phase I Environmental," expected on August 23, 2023, and a survey. (*Id.* at 8-9.) According to Balvant: "If Rise Construction had not wrongfully terminated the Agreement, Fifth Side would have closed on the Minnwest Bank loan on August 25, 2023." (Dkt. 25 ¶ 30.)

Fifth Side filed the instant Motion for Prejudgment Attachment and supporting papers on November 28, 2023. (Dkt. 21.) Fifth Side seeks attachment of the $2.4 million down payment. (Dkt. 27 ¶¶ 1, 9.) Rise Construction filed its opposition on December 5, 2023. (Dkt. 28.) Fifth Side filed a supplemental affidavit from Jay on December 11, 2023. (Dkt. 35.) The Court accepted Fifth Side's supplemental affidavit during the December 12, 2023 hearing and also gave Rise Construction leave to file additional materials at that time. (Dkt. 36.) Rise Construction filed those materials on December 13, 2023. (Dkts. 37, 37-1, Ex. 1-2.) The Motion is now ripe for decision.

## II. LEGAL STANDARD

Fifth Side seeks the remedy of prejudgment attachment under Federal Rule of Civil Procedure 64 and Minn. Stat. § 570.01. (Dkt. 21.) Rule 64(a) provides: "At the commencement of and throughout an action, every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment." Fed. R. Civ. P. 64(a). One such remedy is attachment. Fed. R. Civ. P. 64(b).

Under Minnesota law:

As a proceeding ancillary to a civil action for the recovery of money and to any action brought by the attorney general under the authority of section 8.31, subdivision 1, or any other law respecting unfair, discriminatory, or other unlawful practices in business, commerce, or trade, the claimant, at the time of commencement of the civil action or at any time afterward, may have the property of the respondent attached in the manner and in the circumstances prescribed in sections 570.01 to 570.14, as security for the satisfaction of any judgment that the claimant may recover.

Minn. Stat. § 570.01 (2022).

As to the procedural requirements, the statute provides:

A claimant seeking to obtain an order of attachment in other than extraordinary circumstances shall proceed by motion. The motion shall be accompanied by an affidavit setting forth in detail:

(1) the basis and amount of the claim in the civil action; and

(2) the facts which constitute one or more of the grounds for attachment as specified in section 570.02.

Minn. Stat. § 570.026, subd. 1(1), (2) (2022).

Section 570.02 sets forth several grounds for attachment.  *See* Minn. Stat.

§ 570.02, subd. 1 (2022).  Here, Fifth Side seeks attachment on two grounds.[3]  First, that

Rise Construction has committed an intentional fraud giving rise to the claim upon which

the civil action is brought, and second, that Rise Construction "has violated the law of

this state respecting unfair, discriminatory, and other unlawful practices in business,

---

[3]    In a footnote, Fifth Side appears to argue that it can also establish grounds for section 570.02, subdivision 1(1) which identifies as a ground "when the respondent has assigned, secreted, or disposed of, or is about to assign, secrete, or dispose of, any of the respondent's nonexempt property, with intent to delay or defraud the respondent's creditors."  Minn. Stat. § 570.02, subd. 1(1).  Fifth Side provides no evidence supporting this ground, and the Court does not address it further.

commerce, or trade, including but not limited to any of the statutes specifically enumerated in section 8.31, subdivision 1." (Dkt. 23 at 21-23 (citing Minn. Stat. § 570.02, subd. 1(4), (6)).)

An order for attachment will issue "only if the claimant has demonstrated the probability of success on the merits, and the claimant has demonstrated facts that show the existence of at least one of the grounds stated in section 570.02." *Id*. § 570.026, subd. 3 (2022).

However, even if Fifth Side demonstrates a probability of success on the merits and one of the section 570.02 conditions is met, prejudgment attachment will not issue under two sets of circumstances. The first is if "the circumstances do not constitute a risk to collectibility[4] of any judgment that may be entered." Minn. Stat. § 570.026, subd. 3(1). The second circumstance is if:

> (i) respondent has raised a defense to the merits of the claimant's claim or has raised a counterclaim in an amount equal to or greater than the claim and the defense or counterclaim is not frivolous; and

> (ii) the interests of the respondent cannot be adequately protected by a bond filed by the claimant pursuant to section 570.041 if property is attached; and

> (iii) the harm suffered by the respondent as a result of seizure would be greater than the harm which would be suffered by the claimant if property is not attached.

Minn. Stat. § 570.026, subd. 3(2).

---

[4]     The statute uses "collectibility" rather than "collectability." Minn. Stat. § 570.026, subd. 3(1). The Court does the same in this Order.

Evidence supporting an order of attachment must be by testimony or affidavit alleging specific facts and must be more than a mere recitation of the statutory grounds for attachment. *Greene v. Env't Dev. Corp.*, 415 N.W.2d 374, 377 (Minn. Ct. App. 1987). "Prejudgment attachment is a statutory remedy unk[n]own to the common law and is available only in extraordinary circumstances." *Prospect Commc'ns, Inc. v. Herman*, No. CIV. 13-2557 JNE/FLN, 2014 WL 65822, at *2 (D. Minn. Jan. 8, 2014) (citing *Connecticut v. Doehr*, 501 U.S. 1, 16 (1991)).

## III.   DISCUSSION

The parties do not dispute that this lawsuit falls within the scope of Minn. Stat. § 570.01 and permits an attachment proceeding. Rather, they focus their arguments on whether Fifth Side has demonstrated grounds for attachment, whether Fifth Side is likely to succeed on the merits of its claims, the risk of collectibility of $2.4 million from Rise Construction, whether Rise Construction has meritorious defenses or counterclaims, and whether the harm to Fifth Side if there is no attachment is greater than the harm to Rise Construction if the Court permits attachment. (*See generally*, Dkt. 23 at 14-27; Dkt. 28 at 18-39.) However, "even though a claimant has demonstrated a probability of success on the merits and has demonstrated one of the specific grounds for an order of attachment, the order for attachment may not be granted if" one of the two bases under Minn. Stat. § 570.026, subdivision 3 are met. *Greene*, 415 N.W.2d at 378. The Court therefore first addresses whether one or both of those bases are satisfied.

## A.  Risk of Collectibility

Prejudgment attachment will not issue if: "the circumstances do not constitute a risk to collectibility of any judgment that may be entered."  Minn. Stat. § 570.026, subd. 3(1).  No party addressed who bears the burden of proving whether the requirement of section 570.026, subdivision 3(1) is met.  A nonprecedential case from the Minnesota Court of Appeals suggests that the burden may be on Rise Construction.  *See Pietz v. Fedor*, No. C1-88-1398, 1988 WL 120265, at *1 (Minn. Ct. App. Nov. 15, 1988) ("At the subsequent hearing [to entry of an ex parte order of attachment], the burden of proof was on respondent to demonstrate that the statutory standards set forth at Minn. Stat. § 570.026, subd. 3 (1986) were met.").  However, other cases suggest that the burden remains on Fifth Side as the party seeking the attachment.  *See JA-Father Doe 1 v. Lazzaro*, No. 21-CV-1985 (JWB/DJF), 2023 WL 9284429, at *5 (D. Minn. Dec. 19, 2023) ("The only significant issue in dispute is thus whether Plaintiffs can establish a 'risk of collectability' of any future judgment in their favor."), *R. & R. adopted sub nom.*, 2024 WL 169099 (D. Minn. Jan. 16, 2024); *see also Prospect Commc'ns*, 2014 WL 65822, at *2 (concluding no risk of collectibility where the plaintiff did not suggest any defendant planned to transfer the funds at issue and the evidence suggested that disputed money was "entirely secure"); *MWEM, LLC v. HDC Cos.*, No. C6-01-2196, 2004 WL 2375824, at *3 (Minn. Dist. Ct. July 22, 2004), *amended sub nom.*, 2004 WL 2375827 (Minn. Dist. Ct. Sept. 9, 2004) (concluding no risk to collectibility where there was "no showing" that the assets of the defendants were "somehow extremely limited or subject to immediate foreclosure or disbursement").  Here, the Court concludes that the

requirements of section 571.026, subdivision 3 are met, precluding attachment, regardless of which party bears the burden of proof.

Fifth Side first argues that there is a risk of collectibility because "RISE Modular—Rise Construction's affiliate and the modular building company to which Rise Construction subcontracted construction of the Project's modular units—has furloughed workers and reduced its work load [sic]." (Dkt. 23 at 24 (citing Dkt. 25 ¶ 32).) According to Fifth Side, this demonstrates "that it does not have sufficient work or resources to continue operations." (*Id.*) Fifth Side further asserts through Balvant's affidavit that it "has also learned from industry sources that RISE Modular is facing financial difficulties that **may** prevent it from continuing as a going concern." (*Id.* (citing Dkt. 25 ¶ 32) (emphasis added).) Fifth Side reasons: "RISE Modular is also owned by Lawrence and is the flagship company for Lawrence's modular activities. In other words, if RISE Modular cannot continue its operations, Rise Construction cannot either." (*Id.*) Fifth Side's support for these contentions are Balvant's affidavit, which provides no specifics as to the industry sources regarding Rise Modular's financial difficulties and lack of work and only speculates about Rise Modular's ability to continue as a going concern (Dkt. 25 ¶ 32 (using "may" and "potentially" when describing Rise Modular's ability to continue operations)), and a September 14, 2023 news article reporting that Rise Modular "has instituted a 'partial, temporary furlough' . . . 'in direct response to the company's recent loss of its next scheduled project'" (Dkt. 23 at 2 (citing *Some Workers Temporarily Furloughed at Owatonna Manufacturer*, Steele County Times (Sept. 14,

2023), http://steeledodgenews.com/breaking-news-someworkers-temporarily-furloughed-owatonna-manufacturer (last visited February 27, 2024)).

Rise Construction counters that Fifth Side has "no reasonable basis to fear it will not be able to collect" because Rise Modular—the entity allegedly experiencing financial difficulties—is not a party to the case and because a temporary furlough at Rise Modular does not lead to the conclusion that Rise Construction—the named defendant—will not pay any potential judgment entered against it. (Dkt. 28 at 33.) Rise Construction also argues that it was Fifth Side's failure to secure financial backing to cover the costs of the project that caused Rise Modular "significant harm," resulting in the "temporary financial issues." (*Id.* at 33-34.) While such equitable considerations may not be relevant to the collectibility analysis, linking Rise Modular's financial issues to the failure of the Project supports the conclusion that Rise Modular is not fundamentally unstable.

Fifth Side's "risk of collectibility" evidence consists of a 6-month-old article about a partial, temporary furlough at non-party Rise Modular and unsubstantiated and speculative reports from "industry sources" about Rise Modular's financial difficulties. This is not particularly persuasive as to Rise Construction's ability to satisfy a judgment of $2.4 million. Rise Modular and Rise Construction are two different entities. (Dkt. 29 ¶¶ 6-7.) Fifth Side has offered no evidence of Rise Construction's financial status or demonstrating that Rise Construction is as dependent on Rise Modular as Fifth Side argues. Both entities appear to be adequately funded as to their respective operations. (*Id.* ¶ 9; *see also* Dkt. 32 ¶¶ 3, 5.) Indeed, Fifth Side previously seemed content to rely on the fact that Rise Modular was "financially backed by significant personal family

liquidity as well as several outside investors" before executing the Agreement. (*See* Dkt. 25 ¶ 8.) The Court recognizes that James' support of his son's business interests (Rise Construction and Rise Modular) through Ninth Street does not constitute a commitment to satisfy a judgment, but finds this source of funding relevant to the issue of collectibility given that Fifth Side's argument is based on Rise Modular's alleged inability to continue operations.

Cases finding a risk of collectibility typically involve concrete evidence of financial instability of the defendant or intent to hide or dispose of assets. For example, in *Greene*, the Minnesota Court of Appeals found "ample evidence of a clear risk to collectibility" where the defendant, the chairman of a construction firm, was unable to secure a $65,000 bond for a cost of "only $1,300," the construction firm asked the owners of the home at issue for an additional $5,000 to $6,000 beyond the agreed-upon payments to keep sheetrockers on the job and refused to perform more work when they refused the request, the chairman admitted to the diversion of the homeowner's funds during a deposition, and the construction firm was unable to obtain construction financing. 415 N.W.2d at 375-59. In *Lazzaro*, the court found a risk of collectibility when the defendant transferred "half of his interest in an apartment to his girlfriend while criminal proceedings seeking forfeiture of that same apartment were pending"; had "offshore bank accounts and cryptocurrency holdings that put him in the unique position of being able to retain his wealth while rendering himself judgment-proof"; and, after initiation of the civil lawsuit, "sold off a second property he owned in Hennepin County and four of the six properties he owned in North Carolina." 2023 WL 9284429, at *5-6, *R. & R. adopted*

*sub nom.*, 2024 WL 169099 (D. Minn. Jan. 16, 2024).  In *Dehn v. Dehn*, the court found a

risk of collectibility where the defendant had encumbered property that may have been

used, in part, to satisfy a civil judgment against him through mortgages where the timing

was "suspect" because the closing of one of the mortgages occurred "at or around the

time defendant was scheduled for trial involving the criminal charges" associated with

the civil claims and "the defendant's son inquired when a civil suit might be filed so that

the defendant could transfer at least one property to him."  No. PI04-01473, 2004 WL

5322255 (Minn. Dist. Ct. July 07, 2004).  No such circumstances are present here.

Rise Construction relies on *Pietz v. Fedor* to support its collectibility arguments.

(Dkt. 28 at 34.)  In *Pietz*, after the district court ordered attachment of rent proceeds, the

Minnesota Court of Appeals reversed the order based on "evidence that (1) [the

appellants] were good citizens of the community, (2) they had families in the community,

(3) the allegedly converted assets had been in their bank accounts for months prior to

respondent's application for a writ of attachment, and (4) they had no intentions of

disposing of the assets."  1988 WL 120265, at *2.  Fifth Side is correct that Rise

Construction did not provide this level of evidence to show no risk of collectibility.  But

Fifth Side has cited no case where vague, unsubstantiated allegations of financial

difficulties and a six-month-old article about a furlough are sufficient to show a risk of

collectability.  Here, where there is evidence that both Rise Construction and Rise

Modular are adequately funded through James and Ninth Street to continue operations,

and apparently remain in operation as of the date of this Order, the Court finds the

circumstances do not constitute a risk of collectibility.[5]  *See MWEM*, 2004 WL 2375824, at *2 (finding no risk of collectibility where newly added defendant was "a going entity with assets," including recent payments, and there was no showing that other defendants' assets "[we]re somehow extremely limited or subject to immediate foreclosure or disbursement in some fashion").  The Court denies the Motion because attachment is precluded under Minn. Stat. § 570.026, subdivision 3(1).

**B.     Merits of Defenses or Counterclaims, Bond, and Harm**

Section 570.026, subdivision 3 provides a second ground precluding attachment, namely if the following three conditions are met:

> (i) respondent has raised a defense to the merits of the claimant's claim or has raised a counterclaim in an amount equal to or greater than the claim and the defense or counterclaim is not frivolous; and

> (ii) the interests of the respondent cannot be adequately protected by a bond filed by the claimant pursuant to section 570.041 if property is attached; and

> (iii) the harm suffered by the respondent as a result of seizure would be greater than the harm which would be suffered by the claimant if property is not attached.

Minn. Stat. § 570.026, subd. 3(2).

Fifth Side argues that Rise Construction has not raised a meritorious defense because Rise Construction was not justified in terminating the agreement given that Fifth Side timely paid the $2.4 million down payment, "was transparent and forthcoming with

---

[5]     Rise Construction argues that the law does not support a finding of a risk to collectibility because the $2.4 million is not Fifth Side's property.  (*Id.* at 34.)  The question of which entity owns the $2.4 million is more relevant to the merits of the claims and defenses and harm, and the Court addresses it in those contexts.

the timing for future Project funding," and timely and appropriately responded to requests for financial assurances.  (Dkt. 23 at 25.)  Rise Construction counters:

> [Rise Construction] raises several valid defenses to Fifth Side's baseless claims, including that Fifth Side materially breached the Agreement, [Rise Construction] did not legally cause any damages or injuries allegedly suffered by Fifth Side, and Fifth Side's claims are barred by the express terms of the Agreement. These meritorious defenses find support in several facts, including Fifth Side's failure to secure proper funding for the Project, Fifth Side's express agreement to pay a fully vested, nonrefundable downpayment, and Fifth Side's contractual duty to provide reasonable evidence of financial capability when asked.

(Dkt. 28 at 37 (citations omitted).)

The fact that the $2.4 million down payment was "fully vested" and "non-refundable" renders meritorious Rise Construction's defense that the request for return of that down payment is barred by the express terms of the Agreement.  Perhaps in an attempt to avoid that fact, Fifth Side's brief is replete with allegations of misconduct, including those of untrue statements, bad faith conduct, fraud, theft, an "ulterior motive," a "scheme," and bad intent.  (*See generally* Dkt. 23 at 17-20.)

To demonstrate the alleged misconduct, Fifth Side first relies on "the financial challenges evidenced by the $1.6 million budget deficit **soon after the contract closed**." (Dkt. 28 at 19 (emphasis added).)  As Fifth Side knows, this statement is incorrect.  Rise Construction told Fifth Side about the $1.6 million deficit on May 8, 2023, before the parties executed the Agreement.  (Dkt. 25 ¶¶ 15, 18.)  The Court is not persuaded at this point that the $1.6 million deficit shows intent to defraud or bad motive when Fifth Side knew about the deficit before signing the Agreement and the parties resolved the deficit with each party taking responsibility for about half of the deficit.  (*Id.* ¶ 15.)

26

Fifth Side also relies on what it describes as a lack of "meaningful work" and "escalating and inexplicable requests for greater financial assurances" to show Rise Construction's fraudulent intent.  (Dkt. 28 at 18, 19, 21.)  According to Fifth Side: "The only logical explanation for these financial requests was to ultimately undermine the Project as a cover so Rise Construction could use its ill-gotten gains to satisfy its financial shortcomings."  (*Id.* at 21.)  In other words, Fifth Side is arguing Rise Construction committed to a $25 million Project, then committed at least approximately $400,000 in materials to the Project, and then terminated the Agreement in an elaborate scheme to solely obtain $2.4 million from Fifth Side.

This Court is not persuaded that defrauding Fifth Side is the "only logical explanation" for Rise Construction's requests for financial assurances.  There is sufficient evidence in the record that Rise Construction was genuinely concerned about whether Fifth Side would receive the funding it sought.  Further, Rise Construction has offered evidence of other financial commitments it made based on the Project, including reserving space at Rise Modular's factory using the $2.4 million down payment, and "over $14 million in subcontracts" entered into by Rise Construction.  (Dkt. 29 ¶¶ 40, 80; Dkt. 30 ¶ 9; Dkt. 30-1, Ex. 2 at 6.)  The parties dispute to what extent Fifth Side knew that the downpayment would be needed to secure factory space at Rise Modular. (*Compare* Dkt. 29 ¶ 31 ("[Rise Construction] explained to Fifth Side that there would be large upfront costs for materials, equipment, engaging subcontractors, and reserving and setting up the factory to perform the Project."), *with* Dkt. 35 ¶ 3 ("[Jay] had numerous conversations with Christian Lawrence prior to signing the construction agreement

27

regarding the purpose of the $2.4 million downpayment.  [Christian] explained to me that the purpose of the deposits was primarily to secure materials needed to create the modular boxes for the project.  I was never told that the downpayment was for securing space at RISE Modular's factory.").)  Nevertheless, there is sufficient evidence of Rise Construction's financial commitments arising from the Project and concern about Fifth Side's ability to obtain funding to render meritorious its defense to Fifth Side's claims of bad faith and fraud to the extent they are based on a scheme to obtain $2.4 million for purposes other than the Project.

Moreover, while the parties hotly dispute whether Fifth Side's assurances about its ability to meet its financial obligations were "reasonable," Rise Construction has a meritorious defense that the assurances Fifth Side provided were not "reasonable."  The record is clear that Rise Construction raised concerns about obtaining financing at least as early as July 24, 2023 and engaged with Fifth Side regarding its requests before sending a default letter with a 14-day cure period on August 2, 2023.  (*E.g.*, Dkt. 29 ¶¶ 50-52, 58-59, 65, 75.)  There is also evidence of why Rise Construction was not satisfied by what Fifth Side provided.  (*E.g.*, *id.* ¶¶ 66-74.)  At the hearing, both sides stated they would likely call experts on the issue of reasonableness.  Based on the Court's review of the current evidence, and the complexity of the issue, the Court finds that Rise Construction's defense is meritorious and is not frivolous.  The Court therefore does not address whether Rise Construction's counterclaims are in an amount equal to or greater than the claims.

The Court turns to the bond.  The statute provides, "[b]efore issuing any order of attachment, the court shall require the claimant to post a bond in the penal sum of at least $500," and if considering an amount greater, the court must "consider the value and nature of the property attached, the method of retention or storage of the property, the potential harm to the respondent or any party, and other factors that the court deems appropriate."  Minn. Stat. § 570.041, subd. 1.  Fifth Side urges the Court to find that "a bond in the amount of $500 is reasonable" (Dkt. 27 at 3) but made no argument as to whether or how the bond could adequately protect Rise Construction's interests (*see* Dkt. 23 at 26-27).  Rise Construction argues that it would not be adequately protected by such a bond.  (Dkt. 28 at 37-38.)  Rise Construction specifically identifies its over $2.8 million in non-refundable obligations to its subcontractors, including the $2.4 million payment to Rise Modular, and states it negotiated the non-refundable $2.4 million down payment from Fifth Side "to ensure unforeseen delays or termination would not leave [Rise Construction] entirely exposed to the Project's financial obligation" as evidence that a bond would not protect its interest.  (Dkt. 28 at 37-38; *see also* Dkt. 29 ¶¶ 29, 31, 34-36, 78-83; Dkt. 30 ¶ 9; Dkt. 30-1, Exs. 2, 5.)  The Court finds that a $500 bond would not adequately protect Rise Construction's interests if the $2.4 million were attached.  As Fifth Side proposed no other bond, the Court does not consider alternative amounts.

Finally, the Court turns to the third factor of whether the harm suffered by Rise Construction would be greater than the harm suffered by Fifth Side if attachment were granted.  Fifth Side argues it:

> [I]s merely asking that the significant down payment it paid to Rise Construction (the vast amount of which has not been spent) be attached by the Court pending the litigation so that Fifth Side may recover it upon an entry of judgment. These funds were intended to be spent on the Project, which is no longer going forward, so Defendants could not possibly be harmed by the requested attachment.

(Dkt. 23 at 26-27.)

The Agreement states the $2.4 million down payment was non-refundable. (Dkt. 25-1, Ex. 2 at 8.) Further, contrary to Fifth Side's argument, there is evidence that the $2.4 million was spent on the Project, specifically to cover most of the $2.7 million cost of reserving factory space at Rise Modular. (Dkt. 29 ¶ 40.) Attachment would result in a loss of another $2.4 million from Rise Construction's accounts at a time when it still owes money to other subcontractors. The Court therefore finds that the harm to Rise Construction if it orders attachment outweighs the harm to Fifth Side if the Court does not attach a $2.4 million "non-refundable" and "fully-vested" payment made by Fifth Side pursuant to agreed-upon contract terms.

In sum, all three requirements of section 570.026, subdivision 3(2) are met. This is an independent basis for denying the Motion.

## IV.   ORDER

For the reasons stated above, and based upon all the files, records, and proceedings herein, **IT IS ORDERED THAT**: Plaintiff Fifth Side Lodging, LLC's Motion for Prejudgment Attachment (Dkt. 21) is **DENIED**.

Dated: February 27, 2024              *s/Elizabeth Cowan Wright*
                                       ELIZABETH COWAN WRIGHT
                                       United States Magistrate Judge