# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

Fifth Side Lodging, LLC,

      Plaintiff,

v.

Rise Construction Services, LLC and
Christian Lawrence,

      Defendants and Counterclaim
      Plaintiffs

v.

Jayshal Bhakta, Ravikumar Patel, and
Balvant Patel,

      Counterclaim Defendants.

File No. 23-CV-2649 (JMB/ECW)

**ORDER**

---

David E. Suchar, Emily Anna Taylor, Jason A. Lien, Jevon Bindman, and Leah Natalie Kippola-Friske, Maslon LLP, Minneapolis, MN, for Plaintiff and Counterclaim Defendants Fifth Side Lodging, LLC, and Counterclaim Defendants Jayshal Bhakta, Ravikumar Patel, and Balvant Patel.

Timothy A. Sullivan, Kyle R. Hardwick, Melissa Watton, Best & Flanagan LLP, Minneapolis, MN, for Defendants and Counterclaim Plaintiffs Rise Construction Services, LLC, and Christian Lawrence.

---

This matter is before the Court on the parties' Cross-Motions for Summary Judgment and Defendants/Counterclaim Plaintiffs Rise Construction Services, LLC and Christian Lawrence's Motion for Exclusion of Expert Testimony and Motion in Limine

(together, Rise or Defendants).  (Doc. Nos. 77, 81, 96.)  For the reasons explained below, the Court grants in part and denies in part each of the motions.

## BACKGROUND

This case arises out of the Parties' failed construction contract.  The facts are largely undisputed.

Plaintiff Fifth Side Lodging, LLC is an entity formed for the sole purpose of developing a Fairfield Inn and Townplace Suites hotel in Edina, Minnesota.  (Doc. No. 7 [hereinafter, "FAC"] ¶¶ 1, 6, 8.)  Fifth Side is an affiliate of Hawkeye Hotels, a hospitality firm that develops, constructs, and manages properties in over a dozen states for recognized hotel brands.  (Doc. No. 115 ¶ 3.)  Fifth Side is owned by Balvant Patel and his wife, Anju Patel.  (FAC ¶ 1.)  Counterclaim Defendants Jayshal Bhakta, Ravikumar Patel, and Parth Patel are Hawkeye executives.  (*Id.* ¶ 9.)

Rise is a commercial contractor specializing in "multifamily and hospitality modular construction projects."  (Doc. No. 18 at 15 ¶ 20.)  Rise is the construction arm of modular manufacturing and building company, RISE Modular.  (*Id.* ¶ 22.)  Christian Lawrence is Rise's owner and Chief Executive Officer.  (FAC. ¶ 3.)

In May 2019, Fifth Side and Rise began negotiating the Project in which Rise would serve as general contractor in Fifth Side's construction of a hotel in Edina, Minnesota.  The parties met numerous times for purposes of understanding each other's financial health, general business practices, history in the industry, and overall ability to timely execute the contemplated Project.  Fifth Side even toured RISE Modular's factory in Owatonna, Minnesota, and later paid Rise to construct a sample modular unit.  (Doc. No. 91-1 at

2

53:17–18, 57:12–58:10; Doc. No. 84-1 at 44:24–45:10.)  Throughout these interactions, Lawrence represented that Rise had experience with modular builds on hospitality projects and that Rise could complete Fifth Side's Project faster and at a lower cost using modular construction.  (Doc. No. 91-1 at 30:19–31:3, 57:2–10.)  In 2020, the parties paused negotiations due to the pandemic.

In the summer of 2021, Fifth Side and Rise resumed negotiations and, in early 2023, Rise submitted a series of bids to Fifth Side for the Project.  Fifth Side rejected Rise's first bid of $27.8 million, citing a $25 million budget.  (FAC ¶ 21.)  Fifth Side rejected three more bids from Rise, each of which exceeded $26 million, despite Lawrence's assurances that the bids were "priced aggressively and with very small profit margins" for Rise.  (*Id.* ¶¶ 22–24.)  Nevertheless, on March 16, 2023, Lawrence informed Fifth Side that it would complete the Project for $25.1 million.  (*Id.* ¶¶ 25–27; Doc. No. 18 at 4 ¶ 24.)  Fifth Side decided to close the bidding process and accepted Rise's offer.  (FAC ¶ 26.)

Rise offered "promotional pricing" to Fifth Side to secure the deal, but its internal documents evidence concern that its cost estimate was "very much" understated.  (Doc. No. 107-1 at 9; Doc. No. 107-3 at 2; Doc. No. 107-5 at 3.)  Rise was projected to run a $1.6 million deficit for the Project.  (Doc. No. 107-1 at 9.)  It took on that risk because it wanted to "build its modular portfolio and had enough financial backing from its owners to take a project with a deficit."  (*Id.*)  Documents in the record show that Rise was indeed short on funds during the project.  (*See* Doc. Nos. 107-6, 108-17.)

In late May 2023, Minnwest Bank approved Fifth Side's application for a $31 million construction loan, which would cover 75% of the Project's total cost.  (Doc. No.

3

108-7.)  The rest of the cost was to be covered by Fifth Side.[1]  (Doc. No. 108-8.)  Once the loan was closed, Fifth Side would have access to the funds needed to complete the Project.

On June 1, 2023, Rise and Fifth Side executed a construction contract (Agreement). Because the construction loan had not yet closed, Fifth Side agreed to make downpayments totaling $2.4 million to Rise.  (Doc. No. 107-7 § 5.0.1.)  The Patels and Bhatka also agreed to execute personal guarantees "making each of them jointly and severally liable" under the Agreement.  (Doc. No. 107-7 § 5.0.5; Doc. No. 83-1.)  After the downpayments were received, Rise had the right to request, and Fifth Side had the obligation to provide, "reasonable evidence that [Fifth Side] has the financial capability to continue fulfilling all of its financial obligations under [the] Agreement" (Owner's Financial Assurances).  (Doc. No. 107-7 § 5.0.2.)  If Fifth Side failed to provide Rise with financial assurances under § 5.0.2, Rise could declare default and Fifth Side would have fourteen days to cure the default.  (*Id.* § 5.0.6.)  Absent curative measures, Rise could terminate the Agreement.  (*Id.*)

The construction loan took longer than expected to close.  In July, Minnwest told Fifth Side that it needed to have another bank—Sunrise Bank—guarantee $2.5 million of the loan given its size.  (Doc. No. 107-11.)  In early August 2023, Sunrise Bank requested a new environmental report for the Project, which caused an additional delay of a few weeks.  (Doc. No. 108-10.)  Apparently, these kinds of delays are not unusual.  (Doc. No. 91-3 at 73:1–74:4.)  Minnwest Bank's loan officer, Brad Steiner, anticipated that the loan

---

[1]  Fifth Side also explored another, smaller loan during this process but decided not to pursue it.  (Doc. No. 84-1 at 67:9-–11.)

would close soon after the environmental report was completed.  (Doc. No. 106 ¶ 8.)  The delays in closing the loan nevertheless made Rise anxious.  (*See* Doc. No. 108-25 at 4.)

On July 24, Rise invoked the Owner's Financial Assurances provision and requested that Fifth Side "provide evidence that it has the capability to continue fulfilling all its financial obligations under the Agreement regardless of whether a construction loan is in place." (Doc. No. 107-12.)  Rise requested "copies of any pertinent documentation." (*Id.*) Fifth Side responded that the loan closing was "in process" and expected to be completed in "2-3 weeks." (Doc. No. 107-13 at 5.)  Rise then requested "some kind of documentation substantiating [Fifth Side's] future ability to pay." (*Id.* at 4.)  When Fifth Side was not forthcoming with documentation, Rise reiterated its request for "verifiable documentation evidencing that [Fifth Side] has sufficient funds to satisfy all its financial obligations" under the Agreement.  (*Id.* at 3.)  Rise specifically asked for an updated commitment letter from Minnwest "detailing terms and conditions to closing and the closing date, as well as copies of [Fifth Side's] most recent bank statements evidencing cash on hand." (*Id.*)  Fifth Side responded that a commitment letter from Minnwest would not be available until the loan moved to the closing stage, but that it would add Steiner to its communications with Rise to provide any needed assurances regarding the loan process.  (*Id.* at 2; Doc. No. 106 ¶¶ 4–5.)  Fifth Side also agreed to provide Rise with bank statements the next day.  (Doc. No. 107-13 at 2.)  Steiner told Rise that Minnwest and Fifth Side were "still working towards closing." (Doc. No. 107-16 at 5.)

On July 27, B. Patel sent Rise his most recent bank statement (June 2023), showing $6,077,835.60 in cash that could be used to fund the Project.  (Doc. No. 107-13 at 2; Doc.

No. 108-13.)  On August 2, Rise sent Fifth Side a letter from its outside counsel formally declaring default under the Owner's Financial Assurances provision.  (Doc. No. 107-16.) The letter explained that the account statement was insufficient given that the Project balance was over $22 million, and that Steiner's reference to the working towards closing the loan did nothing to quell Rise's anxiety about the financial viability of the project.  (*Id.*) Rise notified Fifth Side that it would terminate the Agreement if Fifth Side did not deposit "all amounts due and payable under the Agreement" in escrow.  (*Id.*)  Fifth Side responded by asking whether a commitment letter from Minnwest and a date certain for closing the loan would suffice.  (Doc. No. 107-17 at 2.)  Rise said no.  (*Id.*)  Fifth Side then provided Rise with a letter from Hawkeye stating that it had "over $27 million in recurring free cash flow and $37 million in upcoming positive liquidity events" from which Hawkeye is "more than capable of satisfying any upcoming draw requests" from Fifth Side (Hawkeye's affiliate).  (Doc. No. 107-18 at 6.)  Steiner also provided a letter explaining that the loan was on track to close and was being delayed solely due to Sunrise Bank's request for a new environmental report, which Steiner was trying to expedite.  (*Id.* at 7.)  Unpersuaded by this information, Rise terminated the Agreement on August 18, 2023.  (Doc. No. 107-19.)

On August 28, 2023, Fifth Side commenced this action against Rise and Lawrence, alleging that Rise breached the agreement and the implied duty of good faith and fair dealing by wrongfully terminating the Agreement, and that Rise and Lawrence fraudulently induced Fifth Side to enter the Agreement.[2]  (Doc. No. 1; *see also* FAC.)  According to

---

[2]  Fifth Side also brought a civil-theft claim but voluntarily dismissed it.  (Doc. No. 51.)

6

Fifth Side, Rise used the Owner's Financial Assurances provision as a ruse to terminate the Agreement due to its own financially precarious situation. (*See* FAC.) Fifth Side seeks damages and declaratory and injunctive relief. (*Id.* at 24–25.) In response, Rise filed counterclaims alleging that Fifth Side breached the contract by failing to meet the financial assurances provision in the Agreement. (Doc. No. 18.) Rise and Lawrence also sued J. Bhakta and the Patels to enforce their personal guarantees. (*Id.* at 33–34.) Rise seeks damages and declaratory relief. (*Id.* at 34.)

## DISCUSSION

Fifth Side moves for summary judgment on its claims for declaratory relief, breach of contract, and breach of the implied duty of good faith and fair dealing, but it does not move for summary judgment on its claim of fraudulent misrepresentation. Rise moves for summary judgment on all of Fifth Side's claims, as well as its counterclaims for breach of contract, declaratory judgment, and enforcement of the personal guarantees. Rise also separately moves to exclude the expert witness testimony of Ben D. Nolan, III as well as certain post-termination documents and evidence.

Courts grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if it may affect the outcome of the lawsuit." *TCF Nat'l Bank v. Mkt. Intel., Inc.*, 812 F.3d 701, 707 (8th Cir. 2016). A factual dispute is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding summary judgment motions, courts view the evidence and reasonable inferences

7

drawn from it in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Although the moving party bears the burden of establishing the lack of a genuine issue of fact, the opposing party may not "rest on mere allegations or denials but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." *Krenik v. Cnty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995) (quotation omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986) (concluding that summary judgment is properly entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

For the reasons discussed below, the Court denies the summary judgment motions with respect to the breach-of-contract claim, grants Rise's motion as to Fifth Side's claims of breach of the implied duty of good faith and fair dealing and of fraudulent inducement, and denies the Counterclaimants' motion to dismiss Rise's claim to enforce the personal guarantees. In addition, the Court grants in part and denies in part Rise's motion to exclude expert witness testimony and post-termination documents.

## I.   BREACH OF CONTRACT/DECLARATORY JUDGMENT

The parties cross-move for summary judgment on the contract claims and counterclaims (and related declaratory judgment claims), which are essentially mirror images of each other. Fifth Side claims that Rise breached the Agreement's termination provision by wrongly declaring default under the Owner's Financial Assurances provision,

and Rise claims that Fifth Side breached the same provision by not providing adequate financial information, thus permitting it to terminate the Agreement.

The threshold issue presented is whether Rise had the right to terminate under the Owner's Financial Assurances provision. (Doc. No. 107-7 § 5.0.6.) Fifth Side argues that section 15 of the Agreement, which addresses claims between the parties, supersedes Rise's ability to terminate under section 5.0.6. The Court disagrees. Section 15 provides that the parties are obligated to continue operating under the Agreement pending final resolution of any claims by a designated decision maker. (Doc. No. 107-25 § 15.1.4.1.) Section 5.0.6 is the more specific provision in the Agreement that expressly allows Rise to terminate for a breach of section 5.0.2. It is well established that the more specific contractual provision "controls over a general term." *Fortune Funding, LLC v. Ceridian Corp.*, 368 F.3d 985, 990 (8th Cir. 2004). Therefore, section 5.0.6 governs.

Turning to the merits, the question is whether Fifth Side's representations and submissions to Rise were sufficient to constitute "reasonable evidence" of financial viability. Under the Agreement, "[Rise] may request and [Fifth Side] shall provide reasonable evidence that [Fifth Side] has the financial capability to continue fulfilling all of its financial obligations under [the] Agreement." (Doc. No. 107-7 § 5.0.2.) The Agreement does not define the term "reasonable evidence." (*See id.*) The Restatement (2d) of Contracts section 251(e) provides helpful guidance and instructs courts to consider certain factors:

> Whether an assurance of due performance is "adequate" depends on what it is reasonable to require in a particular case taking account of the circumstances of that case. The

> relationship between the parties, any prior dealings that they have had, the reputation of the party whose performance has been called into question, the nature of the grounds for insecurity, and the time within which the assurance must be furnished are all relevant factors.

Here, both parties presented evidence and expert witness testimony to support their positions. (*See* Doc. No. 89-2 (Lawrence Report); Doc. No. 90-6 (Brandt Report).) Given this conflicting evidence, the applicable summary judgment standard, and because the determination of whether Fifth Side provided "reasonable evidence" is a fact-based inquiry, the Court denies both motions.[3]

## II. BREACH OF THE IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING

The parties also cross-move for summary judgment on Fifth Side's claim asserting a breach of the implied duty of good faith and fair dealing. Fifth Side argues that Rise breached this implied duty by making vague and contradictory requests for financial assurances and demanding that the entire contract sum be placed into escrow. The Court is unpersuaded by Fifth Side's position.

"Under Minnesota law, every contract includes an implied covenant of good faith and fair dealing requiring that one party not 'unjustifiably hinder' the other party's performance of the contract." *In re Hennepin Cnty. 1986 Recycling Bond Litig.*, 540

---

[3] Because genuine issues of material fact preclude summary judgment on the breach-of-contract claims, Rise's claim to enforce the personal guarantees of Fifth Side's principals is not yet determinable. Likewise, the scope and measure of damages, including the $2 million termination fee, also depends on the jury's determination on the contract claims and cannot be decided on summary judgment.

N.W.2d 494, 502 (Minn. 1995).  A party breaches the implied covenant when it acts in bad faith, that is, when it "refus[es] to fulfill some duty or contractual obligation based on an ulterior motive."  *Residential Funding Co. v. Terrace Mortg. Co.*, 725 F.3d 910, 918 (8th Cir. 2013) (quotation omitted) (quoting *Sterling Cap. Advisors, Inc. v. Herzog*, 575 N.W.2d 121, 125 (Minn. Ct. App. 1998)); *see also Team Nursing Servs. v. Evangelical Lutheran Good Samaritan Soc'y*, 433 F.3d 637, 641–42 ("[T]he implied covenant of good faith and fair dealing governs the parties' performance and prohibits a party from failing to perform for the purpose of thwarting the other party's rights under the contract.").  A party does not act in bad faith when it exercises its legal and contractual rights.  *Residential Funding*, 725 F.3d at 918; *Herzog*, 575 N.W.2d at 125.

Fifth Side's claim for breach of the duty of good faith and fair dealing is based on the same conduct underlying its breach-of-contract claim: the nature of Rise's requests under the Owner's Financial Assurances provision.  For this reason alone, the good faith and fair dealing claim fails.  *See Turning Point Corp. v. One Diversified, LLC*, No. 24-CV-4566 (LMP/ECW), 2025 WL 1435759, at *3 (D. Minn. May 19, 2025) (citing *Ortega-Maldonado v. Allstate Ins. Co.*, 519 F. Supp. 2d 981, 992–93 (D. Minn. 2007)) ("A claim for breach of the covenant of good faith and fair dealing is duplicative of a breach-of-contract claim, and is properly dismissed, if the claims are based on the 'same conduct.'").

Further, Fifth Side's theory that Rise exhibited bad faith by requesting that the full Project amount be placed into escrow is unavailing.  The request, even if not contractually sanctioned, appears to have been an effort by Rise to resolve an issue that was otherwise at an impasse.  Rise did not demand an escrow payment or suggest that Fifth Side would

be in breach if such payment was not made.  This is simply not evidence of bad faith.  Under these circumstances, no reasonable juror could conclude that Rise breached the implied covenant of good faith and fair dealing.  Summary judgment is granted.

## III.   FRAUDULENT INDUCEMENT

Rise moves for summary judgment on Fifth Side's claim of fraudulent inducement, which centers on Fifth's Side's theory that Rise could not, and perhaps never intended to, complete the Project.  The record does not support Fifth Side's theory.

To state a claim for fraud in the inducement, Fifth Side must establish the following five elements: (1) Rise made a false representation of a past or existing material fact susceptible of knowledge, (2) with knowledge of the falsity of the representation or without knowing whether it was true or false, (3) with the intention to induce Fifth Side to act in reliance thereon, (4) Fifth Side acted in reliance thereon, and (5) Fifth Side suffered pecuniary damage as a result of the reliance.  *Ambassador Press, Inc. v. Durst Image Tech. U.S., LLC*, 949 F.3d 417, 421 (8th Cir. 2020) (citing *Trooien v. Mansour*, 608 F.3d 1020, 1028 (8th Cir. 2010)).  A "misrepresentation of a present intention" can constitute fraud if it can be shown "that the promisor had no intention to perform at the time the promise was made." *Vandeputte v. Soderholm*, 216 N.W.2d 144, 147 (Minn. 1974).

Fifth Side argues that Rise knew that it did not have the financial ability to complete the Project but did not disclose that information.  Fifth Side also suggests that Rise may have agreed to the Project simply to secure millions of dollars in front-end payments before terminating the Agreement.  There are insufficient facts to support either theory.

First, the record does not support a finding that Rise was financially unable to perform under the Agreement, let alone that it believed that to be the case when it signed the Agreement.  It is true that Rise was prepared to lose money on the deal so that it could expand its modular portfolio, but there is no compelling evidence that it was unable to fulfill its contractual obligations.  Nor is there evidence that Rise overstated its financial wherewithal to Fifth Side to secure the Project.

Second, the record is devoid of evidence that Rise negotiated the Project so it could pocket front-end payments and thereafter terminate the contract.  Fifth Side cites to an internal Rise document that discusses possible financial options involving the Project, including terminating the Agreement altogether, among other options.  (Bindman  Decl. Ex. KK.)  But this document was created after Rise declared default and therefore is not material to the fraudulent inducement claim.  (*See* Doc. No. 91-6 at 120:24–121:12.)

Based on this record, no jury could reasonably conclude that Rise fraudulently induced Fifth Side to enter into the Agreement.  Summary judgment is granted.

## IV.    MOTION TO EXCLUDE EXPERT WITNESS EVIDENCE

Rise moves to exclude the expert testimony of Ben Nolan, who opines that Fifth Side had the financial ability to fund the Project, and that Fifth Side met its obligation under the Owner's Financial Assurances provision.  Rise argues that Nolan's first opinion is irrelevant to the narrow contract claims, which center on whether Fifth Side met its obligation under the Agreement's Owner's Financial Assurances provision.  Rise also argues that Nolan improperly relies on documents Fifth Side did not provide to Rise before contract termination.  The Court agrees with Rise.

13

Federal Rule of Evidence 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise."  An expert may testify if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702(a)–(d).  Under Rule 702, an expert must possess the "knowledge, skill, experience, training, or education sufficient to assist the trier of fact . . . ." *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006) (quotation omitted).  This standard is satisfied when the expert's testimony "advances the trier of fact's understanding to any degree." *Id.* (quotation omitted).  The proponent of the expert testimony bears the burden of proving its admissibility by a preponderance of the evidence.  *See Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001).

Here, Nolan's qualifications are not really in dispute.  Rather, the question concerns the scope of his proposed testimony.  As noted, the core issues for the jury are whether Fifth Side met its obligation under the Owner's Financial Assurances provision and, conversely, whether Rise had the right to terminate the Agreement under that provision.  Because Nolan's opinion that Fifth Side had the financial ability to complete the project is irrelevant to those issues, he is barred from testifying on that topic.  The same is true for any post-termination evidence demonstrating Fifth Side's financial wherewithal.  Indeed,

14

the question is not whether Fifth Side could in fact fund the Project, but rather whether it provided Rise with reasonable evidence that it could do so.

As a result, Nolan may not testify as to Fifth Side's financial ability to complete the Project, nor may he discuss post-termination documents he relied on to establish Fifth Side's financial wherewithal. Any post-termination evidence regarding Fifth Side's financial means is likewise inadmissible. Nolan may testify, however, as to whether the documents Fifth Side provided to Rise pre-termination were sufficient, in his opinion, to meet the Owner's Financial Assurances provision.

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. Defendants' Motion for Summary Judgment (Doc. No. 77) is GRANTED IN PART and DENIED IN PART, as set forth above.

2. Plaintiff's Motion for Partial Summary Judgment (Doc. No. 81) is GRANTED IN PART and DENIED IN PART, as set forth above.

3. Defendants' Motion to Exclude Expert Witness Testimony and Post-Termination Evidence (Doc. No. 96) is GRANTED IN PART and DENIED IN PART, as set forth above.

Dated:  March 30, 2026                           /s/ *Jeffrey M. Bryan*
                                                 Judge Jeffrey M. Bryan
                                                 United States District Court

15